IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-00114-01-CR-W-ODS |
| | ) | |
| STEPHEN B. BREWER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Brewer's Motion to Suppress Physical Evidence (doc. #22). For the reasons set forth below, it is recommended that the motion be denied.

## I. BACKGROUND

On April 4, 2007, the Grand Jury returned a seven count indictment against defendant Stephen B. Brewer. The indictment charges defendant Brewer with possession of child pornography and production of child pornography. The indictment also seeks forfeiture of property.

An evidentiary hearing on the motion to suppress was begun on January 29, 2008. Defendant Brewer was represented by retained counsel John P. O'Connor and John Gromowsky. The Government was represented by Assistant United States Attorney Katharine Fincham. The Government called Officers Damon Hawley and Luke Little of the Kansas City, Missouri Police Department, FBI Special Agent Todd Gentry, Sergeant Michael Hicks of the Kansas City, Missouri Police Department, defendant's wife, Loretta Brewer, and Sergeants Chris Raymer and Roy Murry of the Kansas City, Missouri Police Department as witnesses. No witnesses testified on behalf of the defense.

The hearing concluded on January 30, 2008. The Government called Sergeant Kevin Murray of the Kansas City, Missouri Police Department as a witness. Defendant Brewer testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On November 22, 2005, Officer Damon Hawley was at the station when Stephanie Brewer walked in. (Tr. I[1] at 4) Stephanie said her parents were getting a divorce because she had told her mom that her father had assaulted her when she was younger.[2] (Government's Ex. 1) Stephanie told Officer Hawley that she had been raped by her father during a two-year span when she was approximately 13 to 14 years old and in seventh and eighth grade. (Tr. I at 6) At the time of the report, Stephanie was 18 years old. (Tr. I at 7; Government's Ex. 1) Stephanie stated that her father had taken around 900 pictures of her during these sexual acts. (Tr. I at 6) Stephanie stated that her father had many of the pictures saved onto his computer and that he showed her pictures of other nude juveniles. (Tr. I at 8-9; Government's Ex. 1) Stephanie believed the pictures of her were still around because her father recently had made statements that she should not say or do anything because he still had the pictures. (Tr. I at 6-7) Stephanie thought the pictures might be on an external hard drive. (Tr. I at 9) Stephanie told Officer Hawley that her father had previously been in a computer business. (Tr. I at 37-38) Stephanie told Officer Hawley that her father had a very bad temper and that she was scared for her life and for her mother and brother. (Tr. I at 9; Government's Ex. 1) Stephanie told Officer Hawley that she had a dorm room available to her during the holiday if she needed it, but she wanted to spend Thanksgiving with her mother and her brother at their home.[3] (Tr. I at 11, 34) Officer Hawley thought that Stephanie was residing at the family home. (Tr. I at 34) However, the Petition for Order of Protection that Stephanie filled out would suggest that she lived in a dorm room. (Tr. I at 43-44; Government's Ex. 3) Officer Hawley prepared a report of his interview of Stephanie Brewer. (Tr. I at 8; Government's Ex. 1)

2. Stephanie was very scared about what her father would do when he found out that she had gone to the police. (Tr. I at 12) Stephanie wanted her boyfriend to drive her car to his house so that her father would not see it parked at the police station. (Tr. I at 12) Officer Hawley gave Stephanie information regarding obtaining an ex parte

---

[1]"Tr. I" refers to the transcript of the hearing on January 29, 2008.

[2]Loretta Brewer testified that Stephanie told her in September of 2005 that she had been sexually abused by her father. (Tr. I at 142-43) Loretta Brewer had not told her husband the reason she was filing for divorce. (Tr. I at 143) Mrs. Brewer said she had not told her husband the reason because of fear. (Tr. I at 143) Mrs. Brewer testified that she had asked her husband to move out of the house, but he had refused to do so. (Tr. I at 143)

[3]Loretta Brewer testified that the dorms were closing for the holiday, and Stephanie was going to spend the Thanksgiving holiday at home. (Tr. I at 143) Mrs. Brewer had been told by counselors to keep Stephanie away from her father. (Tr. I at 143)

order of protection[4] and about a shelter. (Tr. I at 12) Ex parte orders of protection are to be used when people are in imminent danger of being injured or killed. (Tr. I at 40) Officer Hawley testified that the police do not handle anything in the process of applying for an ex parte order of protection. (Tr. I at 13) When cross-examined about whether he should have concluded that Stephanie no longer resided at her parents' residence based on information she provided in the application for the ex parte order, Officer Hawley responded as follows:

> ... Again, I did not spot read this or check off anything on this. It really didn't matter. I looked at her deal because I remember asking her about this, the ground incident on here. So, I do remember I did glance over it. But this means nothing to me. I get an ex parte. I serve it. It's not issued by my department. I don't have any control over whether she gets this ex parte or does not get this ex parte. Nor do I have any control over what she puts in it. So, it doesn't do anything. And no, it would not clue me in to hey, you're not living at this. It really wouldn't have mattered even if at that point I would have concluded that she didn't live there. Let's say I read this or spot checked it or seen what you're trying to describe to me, and I said, hey, Stephanie, why doesn't this say you're not currently living in there. I still have to serve the ex parte. That's issued by a judge through Jackson County. It has nothing, again, to do with KCPD.

(Tr. I at 44) Officer Hawley cautioned Stephanie about getting an ex parte order because he was concerned that Stephanie's father would then get rid of the evidence before officers could obtain a search warrant. (Tr. I at 12-13) Officer Hawley told Stephanie that she could possibly get an emergency ex parte, but that she would have to stand in front of a judge. (Tr. I at 12) Stephanie wanted to go before the judge. (Tr. I at 12) Officer Hawley contacted the shelter and dropped off Stephanie at the shelter. (Tr. I at 12)

3.  After Officer Hawley took Stephanie to the shelter, he returned to the station to work on obtaining a search warrant. (Tr. I at 14) Officer Hawley knew it would not be easy to quickly obtain a warrant because it was so close to the holiday and because of the time between when the actual crime happened and when Stephanie reported it. (Tr. I at 14) Someone from the shelter called and said that Stephanie had not gotten the emergency ex parte. (Tr. I at 14-15) An officer had to go back to the shelter to pick up Stephanie. (Tr. I at 14-15)

4.  Officer Hawley talked with Stephanie about where the computers in the residence were located and who had access to them to aid officers in obtaining a search warrant for the residence. (Tr. I at 15-16) Stephanie said the bulk of the computer equipment was in the basement, but that there were also one or two laptops upstairs. (Tr. I at 16) Stephanie said that most of the time, her father utilized the computers in the basement, but that she had used them from time to time for various things. (Tr. I at 16) Officer Hawley told Stephanie that if she did get an ex parte, she should let him know because that would "put a jump into things" about obtaining a search warrant. (Tr. I at 16)

---

[4]Loretta Brewer testified that she had attempted to get an ex parte order herself, but had been unable to obtain one. (Tr. I at 144)

5.     Stephanie responded to the station the next day and advised Officer Hawley that she had obtained an ex parte order. (Tr. I at 16) The Petition for Order of Protection was admitted into evidence as Government's Exhibit 3. (Tr. I at 17) Officer Hawley was having so much difficulty trying to get a search warrant through his department that he contacted the FBI to try to obtain a warrant from that angle. (Tr. I at 17) Special Agent Todd Gentry testified that it this point it was still a police matter. (Tr. I at 110) Special Agent Gentry advised Officer Hawley that in his opinion, there was not enough probable cause to obtain a warrant. (Tr. I at 111) However, Special Agent Gentry did offer to help Officer Hawley in any way that he could. (Tr. I at 18) Someone asked Officer Hawley if he had tried contacting Stephanie's mother about getting a consent to search. (Tr. I at 18)

6.     Officer Hawley talked to Stephanie about contacting her mother. (Tr. I at 18) Stephanie was not sure that her mother would sign a consent. (Tr. I at 18) Officer Hawley contacted Stephanie's mother, Loretta Brewer. (Tr. I at 18) Officer Hawley felt that Mrs. Brewer could consent to a search of the residence because it is the wife and husband's household. (Tr. I at 48) Mrs. Brewer would not give Officer Hawley a definitive answer about signing a consent. (Tr. I at 18) Mrs. Brewer's main concern was that Stephanie's younger brother, Christopher, was out with his father and she wanted him back with her. (Tr. I at 18-19) Stephanie wanted the ex parte order to be served that day because Thanksgiving was the next day and she wanted to spend Thanksgiving with her mom and not have to worry about her father. (Tr. I at 20)

7.     Officer Hawley called the Juvenile section of the Kansas City, Missouri Police Department and explained to them that he was going to serve the ex parte and try and get a consent to search from Mrs. Brewer. (Tr. I at 20) Juvenile was on board with Officer Hawley attempting to obtain Mrs. Brewer's consent to search and said that they would respond to the residence to help Officer Hawley recover evidence. (Tr. I at 20)

8.     Mrs. Brewer advised that her husband would be home around 7:00 p.m. (Tr. I at 20) Officer Hawley, his partner, Officer Little, and Special Agent Gentry responded to 11800 Avila Drive at approximately 6:40 p.m. (Tr. I at 20-21, 23) The officers parked their cars away from the residence and waited inside the house. (Tr. I at 21) The officers did not want Stephen Brewer to know they were there because they were afraid he would just drive by the house. (Tr. I at 21) Officer Hawley was worried that Mrs. Brewer would not sign a consent if she did not get custody of Christopher. (Tr. I at 21) The officers also did not want Stephen Brewer to get inside the house because Stephanie and Mrs. Brewer had both advised that he had a bad temper and there were loaded guns inside the house. (Tr. I at 21) There was no discussion amongst the officers about using the ex parte order to keep defendant Brewer from objecting to the search. (Tr. I at 88, 112, 122, 165-66, 180; Tr. II[5] at 5) Mrs. Brewer testified that she had not talked to any officers about using the ex parte order to keep her husband from objecting to a search of their house. (Tr. I at 144)

9.     When the officers got to the house, Mrs. Brewer showed the officers where the guns

---

[5]"Tr. II" refers to the transcript of the hearing on January 30, 2008.

4

were located. (Tr. I at 21) Most of the guns were in the basement. (Tr. I at 21) The objective was to contact Stephen Brewer outside and hope that Mrs. Brewer would get a hold of her son. (Tr. I at 22) The officers asked Mrs. Brewer if there was anything that her husband would need from the house and she replied no, that he had his personal laptop for his business with him. (Tr. I at 78) Mrs. Brewer told Officer Hawley that the laptop her husband had with him was the only computer of which he had exclusive use, all the other computers were used by other members of the family. (Tr. I at 79-80) Officer Hawley testified that he did not ask Mrs. Brewer who actually owned the computers. (Tr. I at 80) Officer Little testified that he understood that Mr. and Mrs. Brewer jointly owned the computers because they used them in their business.[6] (Tr. I at 102)

10.     Stephen Brewer pulled in at approximately 7:20 p.m. (Tr. I at 22) Christopher jumped out of the car and ran inside the house to Stephanie. (Tr. I at 22) Stephanie's car was parked in the driveway. (Tr. I at 60) Officer Hawley and Officer Little met defendant Brewer just outside his van and served him with the ex parte order of protection. (Tr. I at 22-23) Officer Little read the actual ex parte order to defendant Brewer, explaining that he is not to come near the residence, not to contact Stephanie in any way and that he had to leave immediately upon full service of the ex parte. (Tr. I at 23, 98) The court date was explained to defendant Brewer. (Tr. I at 23) Officer Hawley testified that defendant Brewer was very calm and cooperative at the time. (Tr. I at 23) This surprised Officer Hawley given the allegations that were written on the petition. (Tr. I at 23) Defendant Brewer asked if he could go inside the residence to get something. (Tr. I at 24) Officer Hawley told him that because of the circumstances and the guns in the house, he needed to wait a couple of days and then come down to the station and ask for an officer to escort him to get the things he needed from the residence. (Tr. I at 24) Defendant Brewer was told that he was not to come back by himself. (Tr. I at 24) Defendant Brewer signed the paperwork and left. (Tr. I at 23) Defendant Brewer testified that before he left, he told the officers that they needed to leave his property. (Tr. II at 13) Officer Hawley testified that he does not recall defendant Brewer telling the officers not to search the residence. (Tr. I at 23) Officer Hawley testified that defendant Brewer did not tell the officers that they had to leave the residence. (Tr. I at 24) Officer Little testified that defendant Brewer did not say anything about objecting to a search of the house or asking the officers to leave the house while the officers were serving the ex parte order on Brewer. (Tr. I at 88)

11.     After defendant Brewer left, Mrs. Brewer was offered the consent to search and she signed it. (Tr. I at 27) The Consent to Search form read, in part:

                                        Date _11-23-05_      Time _2007_

              I, hereby, freely and voluntarily give my consent to members of the

───────────────

[6]Loretta Brewer testified that Creative Programs Unlimited, Inc. purchased all the computers in the house. (Tr. I at 152) Mrs. Brewer either wrote out the checks to pay for the computers or paid for them online. (Tr. I at 153) Creative Programs Unlimited, Inc. was a company that sold accounting software. (Tr. I at 150) Loretta Brewer did training and defendant Brewer did the install and programming. (Tr. I at 150) Mrs. Brewer was a stockholder in the company and also held the office of corporate secretary. (Tr. I at 150-52)

5

Kansas City, Missouri Police Department to conduct a search of: *11800 Avila Dr.   A single family residence*

(Description of Premises, Property, or Person)

and seize any person, property, item or substance determined by the Kansas City, Missouri Police Department to be relevant either to the matter under investigation or any criminal matter.  I further authorize the making of photographs, video, and sketches of the area being searched.

I understand the police department has no search warrant authorizing this search, that I have a constitutional right to refuse permission for them to conduct the search and any evidence found may be used against me in court.

(Signed) X *Loretta Brewer*

(Government's Ex. 5)  Officer Little testified that the officers discussed with Mrs. Brewer at length the computer media in the house to which she had access.  (Tr. I at 90)  Mrs. Brewer advised that she had access to every part of the house.  (Tr. I at 90)  Mrs. Brewer also advised that she had access to get on and use any of the computers in the house.  (Tr. I at 101, 112)  The search was initiated by the FBI agent and the officers on the scene.  (Tr. I at 70)  After Mrs. Brewer signed the consent, Sergeant Michael Hicks and Detectives Chris Price and Chris Raymer from the Juvenile section came to the residence to assist in the search.  (Tr. I at 27, 69-70, 121)  Mrs. Brewer told Detective Price that she had total access to the residence, including the computers that were downstairs.  (Tr. I at 122-23)  Mrs. Brewer testified at the hearing that she had joint access to all the computers and all the computer media in the house.  (Tr. I at 146-47)  Mrs. Brewer even used the computers on her husband's desk.  (Tr. I at 147)  All the computers had a common password.  (Tr. I at 149)

12.    Approximately an hour or so after defendant Brewer left, somebody came downstairs and told the officers that Brewer was parked outside in his van.  (Tr. I at 24)  By that time, the officers had seen that Brewer had many books on surveillance and a whole bunch of other things, so the officers were going to be cautious about approaching him again.  (Tr. I at 24)  Officer Hawley and his sergeant, Kevin Murray, exited the rear of the residence and approached defendant Brewer's van from opposite sides.  (Tr. I at 24-26)  Defendant Brewer was parked in the street in front of the residence.  (Tr. I at 59; Government's Ex. 4)  Officer Hawley testified that he noticed a glare that was coming off of Brewer's face.  (Tr. I at 26)  Officer Hawley gave Brewer verbal commands to show his hands.  (Tr. I at 26)  Brewer did not comply.  (Tr. I at 26)  Officer Hawley saw that there was a laptop open and that Brewer was actually on the laptop.  (Tr. I at 26)  When Officer Hawley was approximately two to three feet from Brewer and still yelling verbal commands, Brewer shut the top of the laptop and looked at Officer Hawley.  (Tr. I at 26)  Officer Hawley asked Brewer why he was there.  (Tr. I at 26)  Brewer replied that he wanted to get something out of the house.  (Tr. I at 26)  Officer Hawley again explained to Brewer that he was not supposed to be around the residence and that he needed to wait two days and then get a police escort to get the property he needed out of the house.  (Tr. I at 26-27)  Officer Hawley told Brewer that if he came back again, he would be placed under arrest for violation of the ex parte order.  (Tr. I at 27)  Officer Hawley testified that he felt defendant Brewer was violating the ex parte order by harassing Stephanie.  (Tr. I at 60)  Defendant Brewer testified that he reiterated to Officer Hawley that he

6

had already told him he needed to leave the property. (Tr. II at 13) Officer Hawley does not recall defendant Brewer stating that the officers should leave his property or that they did not have consent to search his property. (Tr. I at 66) Sergeant Murray testified that defendant Brewer did not tell the officers to leave the residence nor did he tell the officers that he was objecting to the search of the house. (Tr. II at 8) Brewer left and did not return again that night. (Tr. I at 27)

13. Sergeant Hicks testified that he made the decisions regarding what should be taken and what should be left behind. (Tr. I at 129) Sergeant Hicks stated that anything that could contain a photograph of the victim performing a sexual act on her father, that is everything that could have stored digital information, was taken. (Tr. I at 129)

14. Officer Hawley prepared an inventory report of the computer evidence recovered from the residence. (Tr. I at 28; Government's Ex. 2) The inventory report listed the following:

- Nobilis short tower personal computer and all computer media inside
- HP Pavilion a 630N personal computer and all computer media inside
- HP Laptop/Notebook computer and all computer media inside
- Maxtor External hard drive and all computer media inside
- I-Omega Jazz tape back-up with cartridge and all computer media inside
- Nobilis large tower and all computer media inside
- HP Laptop/Notebook Pavilon N5295 and all computer media inside
- A open short tower personal computer (beige) with 36x max acer compact disc and all computer media inside
- Short tower personal computer with seagate tape drive and all computer media inside
- Aviion data general and all computer media inside
- 9 1.2 gig tape back-ups and all computer media inside
- 4 Jaz 1 gig iomega and all computer media inside
- 10 4 mm data cartridges and all computer media inside
- 4 large 525 mbytes data cartridges and all computer media inside
- large 150 mbytes data cartridges and all computer media inside
- 51 Computer CDs and all computer media inside
- 112 Computer CDs and all computer media inside
- 5 3½" floppy disk and all computer media inside
- 3 Mini Computer CD's and all computer media inside
- 2 Jaz 1 GB data iomega and all computer media inside

(Government's Ex. 2) None of the computer media recovered from the Brewer residence was examined prior to its delivery to the Regional Computer Forensics Laboratory. (Tr. I at 125-26) Mrs. Brewer testified that the computers were not turned on at the house on the night of the search warrant. (Tr. I at 160-61)

15. An additional laptop was recovered from the residence after Stephanie called Officer Hawley and told him that they had missed a laptop that was in her mother's room. (Tr. I at 29) Stephanie said that there were pictures on this laptop. (Tr. I at 29) Stephanie's boyfriend had discovered the child pornography while he was trying to help Mrs. Brewer change the background on the computer and transfer some files from it onto a new laptop that her employer had provided to her. (Tr. I at 156) Officer Hawley responded to the residence. (Tr. I at 30) Stephanie's boyfriend

opened a file on the laptop that had hundreds of pictures of child pornography from websites. (Tr. I at 30) Stephanie's boyfriend also showed Officer Hawley a profile. (Tr. I at 30) Mrs. Brewer told Officer Hawley that the laptop was a common use computer and that she had used it for accounting purposes here and there. (Tr. I at 31) Officer Hawley told Stephanie, Mrs. Brewer and Stephanie's boyfriend to take the laptop to Juvenile. (Tr. I at 30) Mrs. Brewer and Stephanie's boyfriend turned in the laptop and gave statements to the police on December 23, 2005. (Government's Exs. 22 and 23)

16. Detective Chris Raymer applied for a search warrant to examine the seized computer media on January 17, 2006. (Tr. I at 126) The application requested authority to search the seized computer media for evidence of the following:

> Any visual depictions, in part or whole, of minors engaged in sexually-explicit conduct ("child pornography"), as defined in Chapter 573, Revised Statutes of Missouri, including, but not limited to, any electronically stored books, articles, stories, images and/or motion pictures;

> Computer hardware consisting of all such equipment that can collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, to include but are not limited to desktop/laptop;

> Internal and peripheral storage devices, such as hard drives, floppy disks, zip disks, DVD-R/+R/RW and RAM, CR-R/CD-RW disks, data cartridges, compact flash memory cards, memory sticks, SD memory cards, USB drives and other magnetic media and non-volatile memory storage devices;

> Any and all evidence in regard to the rape, sodomy and nude photographing of Stephanie Brewer W/F, 05/04/87 or any minor children.

(Government's Ex. 19) The probable cause statement for the Affidavit/Application for Search Warrant dated January 17, 2006, provides:

> On 11/22/05, an 18 year-old female reported a rape to officers of the Kansas City Missouri Police Department (05-071770). The victim reported that her father, Stephen B. Brewer W/M, 09/21/54, had raped and sodomized her numerous times when she was in the 5th grade until she was in the 8th grade. This would have been when the victim was 10 to 13 years old. The offenses occurred at 11800 Avila Drive in Kansas City, Jackson County, Missouri.

> On 11/23/05, the 18 year old female victim gave a statement to a detective of the Kansas City, Missouri Police Juvenile Section. The victim stated that her father, Stephen Brewer, started having sexual contact with her when she was in the sixth grade being approximately 11 years of age. The victim stated that Stephen Brewer had vaginal intercourse with her approximately five to seven times, anal sex with her two or three times and she performed oral sex on him ten times. All of these offenses occurred at 11800 Avila Drive. The sexual contact would occur when she was home from school or after her mother went to bed. The victim stated the sexual

8

contact stopped when she started attending church and realized that her fathers conduct was wrong. She began to make up excuses to not have contact with her father. In August of 2005 the victim disclosed to her doctor what had occurred and disclosed to 2 separate therapists. She later disclosed to her mother in September of 2005. The police were not notified until late November of 2005. The victim stated it was hard to talk about and only after speaking with the therapist could she begin to disclose what her father did to her.

The victim also stated that Stephen Brewer showed her digital photographs of unknown nude females that appeared to be between the ages of 14 to 15. The photographs were on one of the computers at 11800 Avila Drive. The victim also stated that Stephen Brewer took hundreds of nude digital photographs of her beginning when she was in the fifth grade. The photographs were taken at 11800 Avila Drive and stored on one of the computers at the same address. The victim stated that Stephen Brewer would show her the nude pictures he had taken of her and critique them suggesting other poses for future pictures. The victim stated the nude photos Stephen Brewer took of her were "tasteful" and not sexually explicit. During a follow up interview the victim stated that Stephen Brewer photographed her while she was performing oral sex on his penis. The victim stated that the last time she saw the nude photographs of her was on one of the computers approximately 2 years ago. The victim could not remember if Stephen Brewer showed her the photographs or if she was just on the computer and found them. The victim stated that she was not allowed on the computers unless supervised by her father Stephen Brewer.[7]

The victim stated that about a year and a half ago her father, Stephen Brewer, talked to her about what he had done to her. He told her that he had done some things to her that she might have a hard time forgiving him for and he hoped that one day she would forgive him. Stephen Brewer has recently told her the nude pictures of her are on an external hard drive.

On 11/23/05, the victim obtained an Ex-Parte against Stephen Brewer. Officers of the Kansas City Missouri Police Department served Stephen Brewer with the order on 11/23/05, and advised him he was not to return to 11800 Avila Drive or have contact with the victim. On 11/23/05, officers of the Kansas City Missouri Police Department obtained signed consent to search from the victim's mother for the residence of 11800 Avila Drive. At that time, officers recovered all the listed computer equipment, except for the last listed item.

On 12/23/05, the victim's mother, Loretta Brewer, responded to the Juvenile Section and voluntarily turned in the last listed item, a Hewlett Packard laptop. Loretta Brewer stated her daughter's boyfriend, Justin Wadkins, was working on the laptop when he discovered numerous pictures of child pornography. Justin Wadkins also responded and provided a

---

[7]Sergeant Raymer testified that Stephanie told him that her father would also supervise her mother when she was using a computer. (Tr. I at 172)

statement. He stated that he was helping Loretta Brewer with the laptop when he found 1200 to 1800 pictures of child pornography. He also stated that he found a sexual profile on the victim that he believed Stephen Brewer typed. The sexual profile contained the victim's height, weight, measurements, looks rating, body rating and when she began taking birth control. The profile also described what sexual positions the victim performed including missionary, behind, standing front and standing behind.

(Government's Ex. 19)  Associate Circuit Judge Robert Beaird signed the Search Warrant on January 17, 2006. (Tr. I at 169; Government's Ex. 19)  The Regional Computer Forensics Laboratory discovered thousands of images of nude and semi-nude children and multiple images of Stephanie Brewer engaged in sexual relations with defendant Brewer. (Government's Ex. 11)  Images that depict Stephanie in sexual activity with her father were found on a CD which was recovered from the northwest corner of the basement of the Brewer residence. (Tr. I at 125-26)

17.    On September 27, 2006, Detective Roy Murry applied for a search warrant for the residence at 11800 Avila. (Tr. I at 183)  The Affidavit/Application for Search Warrant dated September 27, 2006, contained the following additional information (the information which had been provided in the affidavit/application dated January 17, 2006, was also included in the affidavit/application dated September 27, 2006):

On January 17, 2006 a search warrant was obtained for all of the computers recovered by officers. During a search of the computers thousands of photographs of naked children were located, as well as the profile of SB described above. During the execution of the search warrant many photographs taken by Stephen Brewer could be traced to Nikon cameras. On September 21, 2006, SB informed detectives that her father would photograph her with Olympus and Nikon cameras. SB's mother confirmed that Stephen Brewer would normally photograph most everything using Nikon digital cameras.

On September 20, 2006 one of SB's former teacher's informed detectives that Stephen Brewer was keeping his daughter's menstrual cycle on his PDA (Personal Data Assistant). In August of 2006 it was also learned form the execution of the search warrant that Stephen Brewer has sent images and other items to his PDA's.

On September 21, 2006 SB confirmed that Stephen Brewer has at least two PDA's, as well as numerous memory sticks for digital cameras he kept in his home. It was also learned that the Ex-Parte SB originally obtained has expired and that Stephen Brewer has moved back into the home on Avila Drive after buying out his former wife's share of the home.

(Government's Ex. 20)  Jackson County Circuit Judge Preston Dean signed the search warrant on September 27, 2006. (Tr. I at 184; Government's Ex. 20)  The search warrant was executed on October 4, 2006. (Tr. I at 184)  Items obtained from the search were turned over to the Regional Computer Forensics Laboratory. (Tr. I at 184)  Detective Murry then applied for another search warrant so that the media seized from the house could be reviewed at the lab. (Tr. I at 184-85; Government's Ex. 21)  The application requested authority to search the seized media for evidence of the following:

Any visual depictions, in part or whole, of minors engaged in sexually-explicit conduct ("child pornography"), as defined in Chapter 573, Revised Statutes of Missouri, including, but not limited to, any electronically stored books, articles, stories, images and/or motion pictures;

Computer hardware consisting of all such equipment that can collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, to include but are not limited to desktop/laptop;

Internal and peripheral storage devices, such as hard drives, floppy disks, zip disks, DVD-R/+R/RW and RAM, CR-R/CD-RW disks, data cartridges, compact flash memory cards, memory sticks, SD memory cards, USB drives and other magnetic media and non-volatile memory storage devices;

Any and all evidence in regard to the rape, sodomy and nude photographing of SB, our then juvenile victim, or any minor children.

(Government's Ex. 21)  Associate Circuit Judge Beaird signed this warrant on October 5, 2006.  (Tr. I at 185; Government's Ex. 21)

## III.  DISCUSSION

Defendant Brewer seeks to suppress "physical evidence obtained through a series of unlawful searches and seizures."  (Motion to Suppress Physical Evidence at 1)  Specifically, defendant argues:

- The November 23, 2005, searches of defendant's residence, computers, and computer paraphernalia were illegal warrantless searches.  (Id. at 5)

    - Law enforcement acted in bad faith in evicting defendant from his residence in order to ensure that he would not object to a warrantless search of it.  (Id. at 5-10)

    - Even if defendant's wife could consent to a search of common areas, she lacked authority to consent to the search and seizure of defendant's computers and peripheral equipment and storage devices.  (Id. at 10-14)

    - The November 23, 2005, search of defendant's residence was illegal because defendant did, in fact, tell police to leave his house.  (Id. at 14-15)

- The laptop computer turned over to police on December 23, 2005, was illegally obtained after police solicited the cooperation of the alleged victim's boyfriend, making him an agent of the state.  (Id. at 15-18)

- The January 17, 2006, search warrant was not supported by probable cause.  (Id. at 18)

11

- The information contained in the search warrant application was impermissibly stale. (Id. at 18-20)

- The information contained in the search warrant application does not provide a nexus between the evidence sought and the items to be searched. (Id. at 20-22)

- All search warrants in this case were defective, in that they did not describe with particularity the child pornography sought. (Id. at 22-24)

- All search warrants in this case were improper because they were obtained through the exploitation of the initial unlawful warrantless search and the government sponsored activities of Mr. Wadkins. (Id. at 24-27)

- All search warrants in this case were unconstitutionally obtained because law enforcement misled the reviewing judges through intentional misinformation and omissions. (Id. at 28-30)

- The January 17, 2006, and October 5, 2006, search warrants were invalid because they were not timely executed. (Id. at 30-31)

- State court judges did not have jurisdiction to issue the search warrants in this case. (Id. at 31-33)

The Court will address each of defendant's arguments.

A.    The November 23, 2005 Consent Search

The Fourth Amendment protects the home from warrantless searches and seizures. See United States v. Dunn, 480 U.S. 294, 300 (1987). However, an exception to this protection occurs where proper consent has been voluntarily given. See United States v. Matlock, 415 U.S. 164, 165-66 (1974).

The Supreme Court has set forth the following with respect to whether a warrantless entry of a residence is valid when based upon the consent of a third party:

> The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained ... from a third party who possesses common authority over the premises. ...
>
> ... "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes ..."

* * *

12

> ... what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Illinois v. Rodriguez, 497 U.S. 177, 181, 188-89 (1990)(citations omitted). See also Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994)("there is no Fourth Amendment violation if the facts available to the officer at the time of the search would warrant a reasonable man in the belief that someone with authority over the premises consented to the search"); United States v. Brokaw, 985 F.2d 951, 953 (8th Cir.), cert. denied, 510 U.S. 913 (1993)("where someone who reasonably appears to have control of the premises in question consents to the search, there is no constitutional violation"). A family member is generally viewed as having common authority over a family residence. As set forth in United States v. Clutter, 914 F.2d 775 (6th Cir. 1990), cert. denied, 499 U.S. 947 (1991):

> As a general consideration, there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house. So, in that sense, absent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family. It is, of course, conceivable that family members will exclude from this common authority access to areas where they wish to maintain an expectation of privacy, even from other members of the family. Accordingly, courts are understandably reluctant to approve third-party consent searches of an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity.

Id. at 777-78.

In this case, Loretta Brewer, defendant's wife, allowed officers to enter her residence to wait for her husband to arrive home so that the officers could serve defendant with an ex parte order of protection. (See Fact No. 8, supra) When the officers got to the house, Mrs. Brewer showed the officers where the guns were located in the residence. (See Fact No. 9, supra) After defendant Brewer was served with the ex parte order of protection and left, Mrs. Brewer signed a consent to

13

search.  (See Fact No. 11, supra)  The Court finds that Loretta Brewer had common authority over the residence and that she voluntarily consented to a search of that residence.  There was no indication that defendant Brewer intended to exclude other members of the family from any part of the residence.

Defendant's argument that law enforcement acted in bad faith in evicting defendant from his residence in order to ensure that he would not object to a warrantless search of it must fail in that there was no evidence presented at the hearing to support this allegation.  Officer Damon Hawley testified that Stephanie wanted the ex parte order of protection because she wanted to spend Thanksgiving with her mom and not have to worry about her father.[8]  (See Fact Nos. 1 and 6, supra)  As Officer Hawley testified, "serving the order of protection ... had nothing to do with preserving evidence inside the house."  (Tr. I at 52)  Other officers (Officer Luke Little, Special Agent Todd Gentry, Sergeant Michael Hicks, Sergeant Chris Raymer, Sergeant Roy Murry and Sergeant Kevin Murray) testified that there were no discussions regarding using the ex parte order to keep defendant Brewer from objecting to the search.  (See Fact No. 8, supra)  Mrs. Brewer also testified that she had not talked to any officers about using the ex parte order to keep her husband from objecting to a search of their house.  (Id.)  "[A]s there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection,"[9] the Court finds the officers were justified in relying on Mrs. Brewer's consent to search.[10]

---

[8]Defendant argues that the officers had "no authority to evict defendant from his house" because Stephanie was no longer living in the residence since she now resided in the dorm at William Jewell College.  (Motion to Suppress Physical Evidence at 8)  However, Mrs. Brewer testified that the dorms were closing for the holiday and Stephanie was going to spend the Thanksgiving holiday at home.  (See Fact No. 1 at n.3, supra)  In addition, Officer Hawley testified that the police did not handle anything in the process of Stephanie applying for the ex parte order of protection.  (See Fact No. 2, supra)  Their job was merely to serve the order.  (Id.)  Finally, Officer Hawley testified that he thought that Stephanie was residing at the family home.  (See Fact No. 1, supra)

[9]Georgia v. Randolph, 547 U.S. 103, 121 (2006).

[10]No argument has been made that the officers had an affirmative duty to seek the consent of defendant Brewer when they already had obtained consent from Mrs. Brewer.  As set

14

Defendant's next argument that his wife lacked authority to consent to the search and seizure of computers and peripheral equipment and storage devices because these items were the property of defendant must also fail in that the evidence presented at the hearing does not support this allegation. Instead, the evidence presented at the hearing showed that Mrs. Brewer had access to and ownership (through Creative Programs Unlimited, Inc.) of all the computers in the residence. As set forth in United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003), "[a] third party has actual authority to consent to a search of a container ... if the third party has mutual use of the container and joint access to or control over the container." Officer Little testified that the officers discussed with Mrs. Brewer at length the computer media in the house to which she had access. (See Fact No. 11, supra) Mrs. Brewer advised that she had access to every part of the house and that she had access to get on and use any of the computers in the house. (Id.) Detective Price testified that Mrs. Brewer said she had total access to the residence, including the computers that were downstairs. (Id.) Mrs. Brewer told Officer Hawley that the laptop her husband had with him was the only computer of which he had exclusive use, all the other computers were used by other members of the family. (See Fact No. 9, supra) Mrs. Brewer testified at the hearing that she had joint access to all the computers and all the computer media in the house.[11] (See Fact No. 11, supra) Mrs. Brewer even used the computers on her husband's desk. (Id.) All the computers had a common password. (Id.) Mrs. Brewer testified that Creative Programs Unlimited, Inc., a company in which she was a stockholder and held the office of corporate secretary, purchased all the computers in the house. (See Fact No. 9, n.6, supra) Mrs. Brewer testified that she either wrote out the checks to pay for the computers or paid for them online. (Id.)

_____

forth in United States v. Alama, 486 F.3d 1062, 1066-67 (8th Cir. 2007), police are not required to obtain the consent of a defendant prior to a search of a house within which he was residing.

[11]The Court notes that Sergeant Raymer testified that Stephanie told him that her father would also supervise her mother when she was using a computer. (See Fact No. 16, n.7) However, the Court finds Mrs. Brewer's testimony credible that she had access to all the computers in the residence.

Case 4:07-cr-00114-ODS   Document 41   Filed 04/04/08   Page 15 of 35

Finally, defendant's argument that the search of his residence was illegal because defendant told police to leave his house must also fail. While defendant Brewer testified that he told the officers to leave, Officer Damon Hawley, Officer Luke Little and Sergeant Michael Hicks testified that defendant did not tell them to leave the property. (See Fact Nos. 10 and 12, supra) The Court finds the testimony of the three officers to be more credible than the testimony of defendant.

B.    The Laptop Computer Turned Over to Police on December 23, 2005

Defendant argues that "detectives told [Stephanie's] boyfriend to search for evidence on their behalf. When the boyfriend willingly complied with the request and uncovered the purported child pornography and 'sexual profile,' he was acing as an agent of the government." (Motion to Suppress Physical Evidence at 17) Defendant's support for this allegation comes from a deposition that Stephanie Brewer apparently gave in a lawsuit pertaining to the divorce of her parents. (Id. at 16) The transcript of this deposition was not presented as evidence in the suppression hearing.

The evidence that was presented at the hearing portrays a somewhat different scenario. Officer Hawley testified as follows:

Q.    Officer Hawley, were you later involved in the retrieval of a laptop, an additional laptop ... from the Avila residence?

A.    Yes, I was.

Q.    Okay. And how did that come about?

A.    Stephanie had called me, and she told me that–she basically just said we missed a laptop. And I said what do you mean we missed a laptop? And she said, well, there's another laptop that's in my mom's room. I said okay. I asked her if she had called Juvenile. And she said no, but I believe she said her boyfriend, I'm not absolutely positive who supposedly found it, but an unknown party basically found pictures on there. She knew there was pictures on there. I said are you absolutely certain, and she said yes. I go, did you tell Juvenile that? And she goes, yes, they told us to bring it in after the weekend. I'm not very good at sitting on things. So, I called Juvenile and I told them, hey, you know, I don't know what you guys got now, but she's saying there are pictures on this computer. And they advised to go ahead and have her bring the computer down if she could. I called Stephanie back. I said, so you've seen these pictures? You know they're on there. And she goes well, I didn't actually see them. And she goes you can come down and look at it if you want. I responded to the address. She did not–she did not pull it up. Loretta was there. Neither one of them would even go near it. It was the boyfriend and sat down and he said, well, there's these

16

files. And he opened the file that had hundreds of pictures of child pornography from websites.

* * *

Q.  Okay. And okay, in addition to the pictures, was there anything else that was of interest on the laptop?

A.  He opened–he had opened something. It was like a profile in Teletype. Because that was one my main things. Stephanie had reported to me that when she told me about the pictures and what-not and I started finding the profiles in the basement, I was interested to know if he actually had profile on his own daughter like he did these other females. And I had inquired with her about that. And he had showed me a profile on there that was similar to the ones I had seen in the file cabinet, but it wasn't on her. And at that time I just said, well, you know, there's no need me looking at this. Go ahead and take it down to Juvenile if you guys can, and I believe they did.

Q.  At this time, did you check with Mrs. Brewer regarding her usage of that laptop?

A.  Yes. She said that–she said that that was a common use computer, that she used it for accounting purposes here and there.

(Tr. I at 30-31) In Officer Hawley's cross-examination, the following exchange took place:

Q.  When Ms. Brewer called, then you turned around and called the Juvenile detectives, and they told–let me just back up. It was my understanding from your testimony that she had tried to contact you and the detectives didn't seem too concerned about the laptop, so she called you?

A.  That's what it sounded like, yes.

Q.  Okay. You didn't want to wait on it, so you called the Juvenile detectives to try to force the issue, is that correct?

A.  Yes.

Q.  Okay. And they told you to tell her to go ahead and look at the stuff or to, you know, search the computer to see if there's anything of value on it, is that correct?

A.  No, I don't recall them telling me to search the computer. I was lucky to get on the phone, I think, at the time because it was the weekend.

Q.  I don't think I–I may have misphrased it. I don't mean to imply that they told you to search the computer. But they told her or her boyfriend to confirm that there was actually criminal pictures on the computer?

A.  When I had talked to Stephanie, she, to me, it already sounded like he had already confirmed. I inquired about the profile. I asked them well, did you see her profile. But as far as what the–I don't–I mean, from she said, it

17

sounded like the Juvenile detectives weren't even that concerned about it. I mean, the whole deal was–yeah, the whole deal was like a giant war and a perfect face. I mean, it was just like pulling teeth trying to get anything done. So, I don't know that they would have told her that, but I don't know for sure because I wasn't there. Nobody had notified me that they instructed to do anything except have her bring the computer down to them.

Q. Okay. Ms. Brewer testified under oath in a deposition that someone from the police department told her and/or her boyfriend to search the computer for evidence of crime. That was not you?

A. No.

(Tr. I at 80-81)

Mrs. Brewer provided the following testimony as to how she and Stephanie's boyfriend discovered the child pornography on the laptop:

Q. At some point did Stephanie's boyfriend–or did you ask Stephanie's boyfriend, Justin, to access items on [a computer left in the master bedroom]?

A. Yes, I did.

Q. How did that come about?

A. Because all my computers were basically gone, my employer purchased a laptop for me to use at home. And then, because my insurance work I do on the Internet, so I was hoping I could do some of the entering at night. And I was trying to get it hooked up. And I'm not computer savvy on hardware. And I asked him one time when he was there to help me get it hooked up so I could get on the Internet.

Q. Okay. And up until the time of the search, had the defendant every say–ever told you you couldn't use this computer or any part of it?

A. No.

Q. So, you asked this of Justin and then what happened?

A. Well, and also there was a picture, the background on the computer and I didn't like that. It was a girl in, I call it a teddy outfit. And I wanted to put something more appropriate on. And so I asked him to change the background on the computer. And I was also looking for some of the files so I could start using just the new notebook.

* * *

Q. Okay. And so what did he start to do?

A. So, he asked me if–I believe he asked me if I had ever, you know, looked on the computer for anything and I said, no, I hadn't. And so we started looking

18

on it and we found stuff.

Q.    Okay.  And what did you find?

A.    We found pictures and I only looked at a very few of them, but they were girls, I'd say, eight years and older.  And they weren't dressed very well. And then I got in some word documents and I started seeing things on some of the people that we had been associated with and profiles like that.  And I decided I don't want to see any more, and so we turned it off.

Q.    And after you saw these things what did you decide to do about it?

A.    I knew I had to turn it in.

Q.    Okay.  So, what did you do?

A.    I was real busy on insurance, because I was coming up to the deadline.  So, it was a couple days or so before I actually–we were talking to the police and they, you know, told them about the computer and the evidence on it.  So, they asked me if I would bring it in.

Q.    And did you, in fact, take it down?

A.    Yes.

(Tr. I at 156-58)  In Mrs. Brewer's cross-examination, the following exchange took place:

Q.    ... And when you later–the laptop, I guess, it was later turned over to the police, did you have any discussion with any detective or any instruction given you or Stephanie's boyfriend that you're aware of to look on the computer for certain images?

A.    Not that I'm aware of.

(Tr. I at 161)

Sergeant Raymer testified that Stephanie's boyfriend had called him to report that he had found numerous pictures of children in pornographic poses while he was looking through a computer at Mrs. Brewer's request and that Mrs. Brewer wanted to turn it over to the police.  (Tr. I at 169)  In cross-examination, the following exchange took place:

Q.    Now, the laptop that was brought to you, did you at any time tell [Stephanie's boyfriend] to try to go on that computer and access information or look for information before he brought it to you.

A.    No.  He called me and said that they had found multiple pictures of child porn on there.  And they wanted to turn it into me, so that's how that happened.

19

Q.      Okay.  Were you the only detective working with them on this–on the laptop?

A.      At that particular time with the laptop, yes.

Q.      Okay.  Stephanie Brewer had given a deposition in her–in the divorce proceeding.  And she was asked a question and then I'm going to read it to you and see if this refreshes your recollection on whether or not you had told them to search the computer.  "Were you aware that Justin was working with your mother to look for some photographs at one point on the computers?"  Answer, "We found that there was a laptop left there.  I really don't remember what happened, but Justin did find pictures.  The detectives told us to go in and look through it, or not us, but Justin, because he could go in and search, or at least knew how–at least to do a fake search for photographs and to go through to see if there was anything on it, to see whether or not we should bring it down."  "Did the detectives talk to Justin?"  "Yes.  And they told him that he could do his own search to find the photos."  "Yes."

A.      No.  That's not what–how I recall it.  They called me, wanted to turn in the computer because it had multiple or thousands of pictures of child porn on there.  I said if you believe it's child pron and she wants to turn it in, it's her computer she can do that and I'd put it into evidence.

Q.      Okay.  So, her recollection of what she just said that that did not happen?  You did not instruct them to do that?

A.      No.  They called me.

Q.      Or instruct Justin to do that?

A.      No.

Q.      I understand they called you–

A.      I said if you–I said if you're looking at them and believe that it's child porn, it's her computer, if she wants to turn it in, you can bring it down and I'll put in into evidence.  I'll take some statements from you.

Q.      Okay.  But you didn't instruct them to search further?

A.      No.  Not that I recall.

(Tr. I at 177-78)

Sergeant Hicks testified that he also did not instruct Stephanie Brewer or her boyfriend to search through the laptop to see if they could find any evidence of criminal activity.  (Tr. I at 135)

As set forth in United States v. Barth, 26 F.Supp.2d 929, 935 (W.D. Tex. 1998), "[p]rivate party conduct does not raise Fourth Amendment concerns; only activity by government agents

20

implicates a person's Fourth Amendment rights."  Defendant cites <u>United States v. Klopfenstine</u>, 673 F. Supp. 356 (W.D. Mo. 1987), for the argument that where a search is conducted by a private individual at the urging or initiation of the government, it is not a private search, and the private party may be regarded as an agent or instrument of the government.  (Motion to Suppress Physical Evidence at 16-17)

The evidence before the Court clearly shows that the search of the laptop conducted by Mrs. Brewer and Stephanie's boyfriend was a private search.  It was not done at the urging or initiation of the government.  There was no violation of the Fourth Amendment.

C.    <u>The Search Warrants</u>

As set forth above, defendant Brewer argues that the search warrants obtained in this case were defective for the following reasons:

- The January 17, 2006, search warrant was not supported by probable cause. (Motion to Suppress Physical Evidence at 18)

  - The information contained in the search warrant application was impermissibly stale.  (<u>Id.</u> at 18-20)

  - The information contained in the search warrant application does not provide a nexus between the evidence sought and the items to be searched.  (<u>Id.</u> at 20-22)

- All search warrants in this case were defective, in that they did not describe with particularity the child pornography sought.  (<u>Id.</u> at 22-24)

- All search warrants in this case were improper because they were obtained through the exploitation of the initial unlawful warrantless search and the government sponsored activities of Mr. Wadkins.  (<u>Id.</u> at 24-27)

- All search warrants in this case were unconstitutionally obtained because law enforcement misled the reviewing judges through intentional misinformation and omissions.  (<u>Id.</u> at 28-30)

- The January 17, 2006, and October 5, 2006, search warrants were invalid because they were not timely executed.  (<u>Id.</u> at 30-31)

- State court judges did not have jurisdiction to issue the search warrants in this case.  (<u>Id.</u> at 31-33)

The United States Supreme Court has set forth the following with respect to what is required for a valid search warrant:

The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ... [T]his Court has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched.

Dalia v. United States, 441 U.S. 238, 255 (1979)(citations omitted).

The Eighth Circuit Court of Appeals has set forth the following with respect to probable cause in a search warrant:

"Probable cause to issue a search warrant exists when an affidavit ... in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence of' criminal activity will be found in the particular place to be searched." United States v. Davis, 471 F.3d 938, 946 (8th Cir. 2006)(quoting Illinois v. Gates, 462 U.S. 213, 238 ... (1983)). The determination of probable cause is made after considering the totality of the circumstances. United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007). After a judge has issued a search warrant upon a finding of probable cause, "that finding deserves great deference." Walden [v. Carmack, 156 F.3d 861,] 870 [(8th Cir. 1998)] (citing Gates, 462 U.S. at 236 ...). Thus, when reviewing the sufficiency of the ... affidavit supporting a search warrant that was found by the issuing judge to provide probable cause, we give great deference to the issuing judge's finding. Id.

United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007).

The Court will address defendant's arguments as to why the search warrants issued in this case are not valid.

1.    Staleness of Information

As in United States v. Brinklow, 560 F.2d 1003 (10th Cir. 1977), cert. denied, 434 U.S. 1047 (1978), there appears to be no controversy that probable cause was presented that the items being sought by the search warrant were in the residence at one time.[12] However, "[p]robable cause ceases to exist when it is no longer reasonable to presume that items, once located on the premises, are still

---

[12] "[W]hile the information [contained in the search warrant application] may have supported a finding of probable cause at the time the crimes investigated allegedly occurred, by the time the search warrant application was finally filed, the information was fatally stale, and investigators did nothing to demonstrate that any criminal behavior was ongoing or that evidence of ancient criminal behavior could still be found." (Motion to Suppress Physical Evidence at 18)

there." Id. at 1005.  As stated by the <u>Brinklow</u> court:

> Probable cause is not determined by merely counting the number of days between the time of the facts relied upon and the warrant's issuance.  The significance of the length of time between the point probable cause arose and when the warrant issued depends largely upon the property's nature and should be contemplated in view of the practical considerations of every day life.  The test is one of common sense.

<u>Id.</u> at 1005-06 (citations omitted).

Reviewing courts should not make a de novo determination of probable cause.  Instead, the decision to issue a search warrant is to be upheld if supported by a substantial basis in the record. See <u>Illinois v. Gates</u>, 462 U.S. 213, 238-39 (1983).  Deference should be given to determinations of probable cause by issuing judges.  As stated by the Supreme Court:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed.

<u>Id.</u>

This Court believes that the issuing judge had a substantial basis for concluding that probable cause was present to issue the January 17, 2006 search warrant based on the affidavit of Detective Chris Raymer.  In addition to the dated information from Stephanie Brewer about the sexual abuse she had suffered, the nude digital photographs that had been taken of her and the digital photographs of nude juveniles and of Stephanie herself that Stephanie had viewed on the computer, the Affidavit also contains more recent information.  (<u>See</u> Fact No. 16, <u>supra</u>)  The Affidavit states that Stephen Brewer had recently told Stephanie that the nude pictures of her are on an external hard drive.  (<u>Id.</u>)  The Affidavit states that on November 23, 2005, pursuant to Loretta Brewer's consent, officers recovered all the computer equipment listed in the Affidavit, except for the last listed item.  (<u>Id.</u>)  Finally, the Affidavit provides:

> On 12/23/05, the victim's mother, Loretta Brewer, responded to the Juvenile Section and voluntarily turned in the last listed item, a Hewlett Packard laptop.  Loretta Brewer stated her daughter's boyfriend, Justin Wadkins, was working on the laptop when he discovered numerous pictures of child pornography.  Justin Wadkins also responded and provided a statement.  He stated that he was helping Loretta

Case 4:07-cr-00114-ODS   Document 41   Filed 04/04/08   Page 23 of 35

Brewer with the laptop when he found 1200 to 1800 pictures of child pornography. He also stated that he found a sexual profile on the victim that he believed Stephen Brewer typed. The sexual profile contained the victim's height, weight, measurements, looks rating, body rating and when she began taking birth control. The profile also described what sexual positions the victim performed including missionary, behind, standing front and standing behind.

(Id.) The facts in the Affidavit which relate to information provided by Stephanie Brewer provide background information and do not detract from the more recent information set forth above. As stated by the Eighth Circuit in United States v. Macklin, 902 F.2d 1320 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991):

> Appellants ... make a related probable cause argument, that the information contained in the affidavit of December 9, 1986, some of it dating to 1977, is stale. While the affidavit does contain information from the late 1970's and early 1980's, this information is provided as mere background, and its presence does not taint more recent information in the affidavit. We agree with the First Circuit that "[w]here recent information corroborates otherwise stale information, probable cause may be found." Emery v. Holmes, 824 F.2d 143, 149 (1st Cir. 1987). Most of the information in the affidavit of December 9, 1986, is from 1986, much of it from September through November of 1986. It would be ludicrous to find that an affidavit with such current information were stale merely because of the presence of earlier, historical information.

Id. at 1326.

### 2. Nexus Between Evidence Sought and Items to be Searched

Defendant sets forth the following argument with respect to the alleged lack of probable cause to search the seized computer media:

> In the January 17, 2006, search warrant application, there are no facts describing with sufficient particularity any nexus between the evidence sought and any of the items to be searched. The application states that the alleged victim saw illegal photographs on one of defendant's computers at least two years earlier. However, it does not state which computer that was–or even whether any of the computers to be searched were in the house two years earlier. Without a further description of the specific computer, there can be no nexus.

(Motion to Suppress Physical Evidence at 21)

The affidavit supports the inference that defendant Brewer used a variety of means to record and store images of child pornography and sexual abuse of his daughter. The affidavit mentions that defendant showed Stephanie digital photographs of unknown nude juveniles on a computer at the residence. (See Fact No. 16, supra) The affidavit further mentions that defendant took nude digital

24

photographs of Stephanie beginning when she was in the fifth grade as well as photographs of Stephanie performing sexual acts on defendant and then stored them on a computer at the residence. (Id.)  Defendant had recently told Stephanie that the nude pictures of her were on an external hard drive.  (Id.)  Finally, a laptop at the residence was reported to contain 1200 to 1800 pictures of child pornography as well as a typed sexual profile on Stephanie.  (Id.)

Defendant Brewer's use of a digital camera to record nude images of Stephanie as well as images of Stephanie performing sexual acts provides probable cause to search any storage media that would accommodate digital images.  See United States v. Flanders, 468 F.3d 269, 271-72 (5th Cir. 2006)(use of digital camera to photograph naked child whom defendant had allegedly previously sexually exploited supported probable cause for search of home computer).  The fact that old computers may be gone or that new computers may have been purchased does not defeat probable cause.  It is common knowledge that digital images can easily be transferred between storage media.

### 3.    Particularity of Description of Child Pornography

Defendant argues that the search warrant applications should have contained more than conclusory statements that pornographic images had been discovered during the course of the investigation.  (Motion to Suppress Physical Evidence at 23)  "No description of the supposed child pornography was given, nor were copies of the images provided for the judge's review."  (Id.) However, images of child pornography need not be found prior to the issuance of a search warrant. See United States v. Rogers, 165 Fed. Appx. 873, 874 (2nd Cir. 2005), cert. denied, 126 S.Ct. 2931 (2006).  Given the reported sexual abuse of Stephanie Brewer which was recorded digitally by her father, the hundreds of nude photographs that were allegedly taken of Stephanie by her father, the images of other nude juveniles that Stephanie advised her father showed her and the fact that Justin Wadkins reported that he had discovered 1200 to 1800 pictures of "child pornography" as well as a sexual profile containing various information about Stephanie including the sexual positions

25

Stephanie performed[13] (see Fact Nos. 16 and 17, supra), the Court finds that the affidavits provided a sufficient description of the evidence of criminal activity would could be expected to be found on the media to be searched.

The constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the ... objects to be seized." United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980)(citing Steele v. United States, 267 U.S. 498, 503-04 (1925)).

The warrant contains the following description of the items to be seized:

> Any visual depictions, in part or whole, of minors engaged in sexually-explicit conduct ("child pornography"), as defined in Chapter 573, Revised Statutes of Missouri ...

> * * *

> Any and all evidence in regard to the rape, sodomy and nude photographing of [Stephanie Brewer] or any minor children.

(See Fact Nos. 16 and 17, supra)  This Court finds that the warrant describes with sufficient particularity the items to be seized by officers.

### 4. Warrantless Search By Stephanie's Boyfriend

Defendant Brewer argues that "all search warrants in this case are improper because they exploit the illegality of the initial unlawful warrantless searches of police and police in conjunction with Mr. Wadkins."  (Motion to Suppress Physical Evidence at 24)

As set forth above in Section III.B., the evidence presented at the hearing clearly shows that the search of the laptop conducted by Mrs. Brewer and Stephanie's boyfriend was a private search that was not done at the urging or initiation of the government.  Given that the information was not obtained in violation of the Fourth Amendment, the officers properly used the information in their affidavits to obtain the search warrants.

---

[13]The September 27, 2006 application also provided that during a search of the computers pursuant to the January 17, 2006 search warrant, "thousands of photographs of naked children were located, as well as the profile of SB described above."  (See Fact No. 17, supra)

5.    Misinformation and Omissions

Defendant lists the following facts in his Motion to Suppress Physical Evidence which

defendant claims were either intentional misinformation or omissions from the affidavits in support

of the search warrants:

a.    The affiant stated that Ms. Brewer last saw supposedly illicit photographs on
defendant's computers two years ago.  Ms. Brewer actually told police she had not
seen any images for two to three years.  By editing Ms. Brewer's statement, police
were attempting to make their information appear less stale.

b.    Another significant misstatement is the assertion that defendant recently told Ms.
Brewer that nude pictures of her were stored on an external hard drive.  In her initial
interview with police, Ms. Brewer told the reporting officer that she overheard
defendant say something to an unknown party about pictures being on an external
hard drive.  In a follow up interview, Ms. Brewer was asked whether she was a party
to the conversation.  She said that she thought she was, but she did not really know
for sure.

c.    Police never indicate that prior to requesting the search warrants they had already
opened files on computers and storage devices without a warrant.  This is true as to
the computers and other devices seized in the November 2005 consent search and as
to the laptop computer and other devices turned over to police subsequent to that
search.

d.    Another noteworthy omission is the fact that police had Mr. Wadkins conducting
warrantless searches of defendant's property.

e.    When police requested the search warrants, they knew not only the description of the
computer on which Ms. Brewer last allegedly saw child pornography, but they also
knew that defendant frequently replaced old or otherwise obtained new computers.
In fact, some computers seized and eventually examined were only two to three years
old, and none of the computers were obtained earlier than 2000.  The reviewing
judges should have been provided this information because it would have permitted
them to see that it was apparent the computers seized by police during their initial
warrantless search were unlikely the computers on which child pornography
supposedly was stored.

(Motion to Suppress Physical Evidence at 28-30)

The Eighth Circuit Court of Appeals has set forth the following with respect to warrant

affidavits that are found to contain falsehoods or omissions:

A facially valid warrant affidavit is constitutionally infirm if the defendant
establishes that the affidavit includes deliberate or reckless falsehoods that, when
redacted, render the affidavit's factual allegations insufficient to support a finding

of probable cause. Franks v. Delaware, 438 U.S. 154, 171 (1978).[14] Omissions likewise can vitiate a warrant if the defendant proves "first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002).

United States v. Ketzeback, 358 F.3d 987, 990 (8th Cir. 2004)(footnote supplied). The Ketzeback court set forth three steps to determine whether a warrant should be vitiated pursuant to Franks: (1) whether the officer intentionally omitted information from his affidavit; (2) whether the officer omitted the facts with the intent to mislead or in reckless disregard of the omissions' misleading effect; and (3) whether the officer's affidavit would not have been sufficient to support a finding of probable cause if the omitted facts had been included. Id. at 990-91.

The Court will address the alleged omissions and misstatements:

a.      The affiant stated that Ms. Brewer last saw supposedly illicit photographs on defendant's computers two years ago. Ms. Brewer actually told police she had not seen any images for two to three years. By editing Ms. Brewer's statement, police were attempting to make their information appear less stale.

Detective Raymer's Affidavit actually states, "The victim stated that the last time she saw the nude photographs of her was on one of the computers approximately 2 years ago." (See Fact No. 16, supra) In her statement taken by Detective Raymer, Stephanie stated, "I don't remember the last date I saw the pictures, it was probably two to three years ago." (Government's Ex. 18) When questioned about the difference, Sergeant Raymer testified, "I put approximately two years instead of two to three. I didn't really think it mattered." (Tr. I at 175) "Approximately two years ago" does not appear to be a significant improvement over "probably two to three years ago" in terms of whether the information is fresh or stale. The Court does not find "approximately two years ago" to be a deliberate or reckless falsehood.

b.      Another significant misstatement is the assertion that defendant recently told Ms. Brewer that nude pictures of her were stored on an external hard drive. In her initial interview with police, Ms. Brewer told the reporting officer that she overheard defendant say something to an unknown party about pictures being on an external hard drive. In a follow up interview, Ms. Brewer was asked whether she was a party to the conversation. She said that she thought she was, but she did not really know

----

[14]In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the Supreme Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

for sure.

Detective Raymer's Affidavit actually states, "Stephen Brewer has recently told her the nude pictures of her are on an external hard drive." (See Fact No. 16, supra) In Stephanie's statement taken by Detective Raymer, the following exchange took place:

> Q.    Has your father mentioned anything about the pictures recently?
> A.    He said the pictures is on the external hard drive.
>
> Q.    Was he talking to you?
> A.    I think he was.  I really don't remember what the conversation was about.  I really don't know for sure.

(Government's Ex. 18)  Officer Hawley testified about this subject as follows:

> She [Stephanie] had just mentioned that she had overheard, when she described it as if she overheard a conversation between her dad and somebody else on a phone, an unknown party.  But when she described it, it was almost as if he was talking to her but he was on the phone with an unknown party, like he wasn't trying to be apparent or obvious that he was telling her I still have these pictures but yet he was.

(Tr. I at 7)  In cross-examination, Officer Hawley was asked if Stephanie took that conversation to be a threat to her and he responded, "She felt that way, yes." (Tr. I at 32)  It appears that Stephanie believed her father purposely allowed her to overhear a telephone conversation in which he told an unknown party that he had pictures of Stephanie stored on an external hard drive.  In other words, Stephanie felt that her father let her know he still had the pictures on an external hard drive.  The Court does not find the statement "Stephen Brewer has recently told her the nude pictures of her are on an external hard drive" to be a deliberate or reckless falsehood.

c.    Police never indicate that prior to requesting the search warrants they had already opened files on computers and storage devices without a warrant.  This is true as to the computers and other devices seized in the November 2005 consent search and as to the laptop computer and other devices turned over to police subsequent to that search.

The evidence presented at the hearing does not support defendant's allegations.  The evidence presented at the hearing was that none of the computer media recovered from the Brewer residence on November 23, 2005, was examined prior to its delivery to the Regional Computer Forensics Laboratory.  (See Fact No. 14, supra)  Mrs. Brewer testified that the computers were not turned on at the house on the night of the search warrant.  (Id.)  While Officer Hawley did view some items from the laptop in December of 2005, the files had been opened by Mrs. Brewer and Stephanie's boyfriend acting on their own.  (See Fact No. 15, supra)

d.    Another noteworthy omission is the fact that police had Mr. Wadkins conducting warrantless searches of defendant's property.

As set forth above in Section III.B., the evidence presented at the hearing clearly shows that the search of the laptop conducted by Mrs. Brewer and Stephanie's

29

boyfriend was a private search that was not done at the urging or initiation of the government.

e.     When police requested the search warrants, they knew not only the description of the computer on which Ms. Brewer last allegedly saw child pornography, but they also knew that defendant frequently replaced old or otherwise obtained new computers. In fact, some computers seized and eventually examined were only two to three years old, and none of the computers were obtained earlier than 2000. The reviewing judges should have been provided this information because it would have permitted them to see that it was apparent the computers seized by police during their initial warrantless search were unlikely the computers on which child pornography supposedly was stored.

As set forth above in Section III.C.2., the fact that old computers may be gone or that new computers may have been purchased does not defeat probable cause. It is common knowledge that digital images can easily be transferred between storage media.

The Court does not believe that the officers omitted any pertinent information from or misstated any pertinent information in the affidavits/applications for search warrants. Certainly, no evidence has been presented to suggest that the officers intentionally omitted or misstated any pertinent information.

The Court finds that defendant Brewer did not meet his burden of establishing by a preponderance of the evidence that the officers misled the judges by omitting information from the affidavits and/or by including information in the affidavits that they knew to be false or would have known to be false, except for a reckless disregard for the truth.

6.     Timely Execution of Warrants

Defendant argues that the January 17, 2006, and October 5, 2006, search warrants commanded that the warrants be executed within ten days of the applications. (Motion to Suppress Physical Evidence at 30) The seized computers and peripheral equipment and devices were turned over to a crime lab where technicians did not examine the items for several months. (Id. at 31) Because the warrants were not timely executed, defendant contends that all evidence obtained as a result of these warrants must be suppressed. (Id.)

The same argument was made and rejected in United States v. Luken, 515 F.Supp.2d 1020 (D.S.D. 2007), a case in which a forensic examination of computer evidence was not performed

within the ten-day limitation contained in the state warrant. The <u>Luken</u> court found:

> ... The ten day requirement contained in the warrant executed by the state court Magistrate Judge was a South Dakota statutory requirement. <u>See</u> SDCL 23A-35-4. In a federal prosecution, however, "we evaluate a challenge to a search conducted by state authorities under federal Fourth Amendment standards." <u>United States v. Bieri</u>, 21 F.3d 811, 816 (8th Cir. 1994), <u>cert. denied</u>, 513 U.S. 878 ... (1994). ... The ultimate question, therefore, is whether the search was reasonable, measured by Fourth Amendment standards.

The Eighth Circuit has explained that

> > Generally, search warrants must be executed within ten days of being issued. This Court has stated that search warrants are to be executed promptly. Timeliness of execution should not be determined by means of a mechanical test with regard to the number of days from issuance, nor whether any cause for the delay was per se reasonable or unreasonable. Rather it should be functionally measured in terms of *whether probable cause still existed at the time the warrant was executed.* ... [O]ur review is limited to determining whether the officers were reasonable in their belief that probable cause still existed at the time the warrant was executed.
>
> > In determining whether probable cause dissipated over time, a court must evaluate the nature of the criminal activity and the kind of property for which authorization to search is sought. ...

<u>United States v. Simpkins</u>, 914 F.2d 1054, 1058 (8th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1101 ... (1991).

The federal equivalent of SDCL 23 A-35-4 is found in Fed.R.Crim.P. 41(e)(2)(A)(formerly Rule 41©). In the context of a nighttime search which violated the provisions of Rule 41©, the Eighth Circuit has noted "suppression is not automatic if Rule 41(c)(1) is violated. Instead, we consider whether the defendant is prejudiced or reckless disregard of proper procedure is evident." <u>United States v. Berry</u>, 113 F.3d 121, 123 (8th Cir. 1997). In this case, Agent Boone diligently tried to comply with the requirements of the warrant by shipping the hard drive to Pierre for evaluation within a few days of the date the warrant was executed, and there has been no showing that the probable cause which existed when the warrant was issued dissipated before the forensic exam was completed. Likewise, there has been no showing the Defendant was prejudiced by the delay, or that Agent Boone recklessly disregarded proper procedure.

The case law on the subject is sparse, because it is a relatively new area of the law. Some guidance is offered, however, by other District Court decisions. <u>See</u> <u>e.g.</u> <u>United States v. Grimmett</u>, 2004 WL 3171788 (D. Kan. [Aug. 10, 2004]). In <u>Grimmett</u>, the Court rejected the defendant's suppression motion, noting:

> > The court, however, does not find the failure to search the computer's hard drive and computer disks within the 96-hour period violative of the Fourth Amendment ... [T]he Court need only consider if the defendant's Fourth Amendment rights were violated, not whether state law was violated. ... This is because the exclusionary rule is only concerned with deterring federal

31

Constitutional violations. ... The conduct of law enforcement officers in executing a search warrant is government by the Fourth Amendment's mandate of reasonableness. The Fourth Amendment does not provide a specific time in which a computer may be subjected to a government forensic examination after it has been seized pursuant to a search warrant. The court finds that the Fourth Amendment requires only that the subsequent search of the computer be made within a reasonable time. The court believes that it is reasonable to conduct a search of a computer off-site, after the return of the warrant.

See also United States v. Syphers, 296 F.Supp.2d 50, 58 (D.N.H. 2003)(defendant's motion to suppress search of computer contents denied when search was completed seven months after seizure because time frame was not unreasonable and state did not "overstep any constitutional boundaries."); United States v. Hernandez, 183 F.Supp.2d 468, 480 (D. Puerto Rico 2002)(one and one half month delay in examination of computer and disks did not mandate suppression of evidence because delay was "reasonable" under the circumstances). For these reasons, I find search was reasonable under the Fourth Amendment even if the ten day time limitation was exceeded. The search of Mr. Luken's computer, therefore, was permissible and properly conducted pursuant to the warrant.

Luken, 515 F.Supp.2d at 1037-38.

As in Luken, the ten day requirement contained in the warrants signed by the state court judges was a state statutory requirement. See Mo. Rev. Stat. § 542.276.8. However, as in Luken, the search must be deemed reasonable, measured by Fourth Amendment standards. In this case, the evidence was sent to the Regional Computer Forensic Laboratory for evaluation. There has been no showing that the probable cause which existed when the warrants were issued dissipated before the forensic exams were completed. Likewise, there has been no showing that defendant Brewer was prejudiced by the delay or that the police recklessly disregarded proper procedure. As in Luken, the Court finds the searches were reasonable under the Fourth Amendment even though the ten day limitation was exceeded.

### 7.    Jurisdiction to Issue Warrants

Finally, defendant argues that "because agents of the federal bureau of investigation were involved in the initial warrantless search of defendant's house and computers" the case became a "joint state and federal operation." (Motion to Suppress Physical Evidence at 31) Defendant further argues that state court judges do not have jurisdiction to issue search warrants in joint state and federal operations unless a federal magistrate judge is not reasonably available. (Id. at 32)

32

As set forth above, Officer Hawley contacted the FBI when he was trying to obtain a search warrant for defendant Brewer's residence. (See Fact No. 5, supra) Special Agent Todd Gentry testified that it this point it was still a police matter. (Id.) Although Special Agent Gentry advised Officer Hawley that he did not feel he could help him obtain a search warrant, he did offer to help in any way that he could. (Id.) Special Agent Gentry testified at the suppression hearing that he was the only FBI officer present during the consensual search of the house. (Tr. I at 111) When asked what he did during the search, Special Agent Gentry replied:

> I really just kind of milled around and–from my computer background a couple times the officers would ask me if this was computer media, that kind of thing. I didn't really do a search myself. Just tried to provide some guidance.

(Tr. I at 112-13) Special Agent Gentry testified that other than fielding some questions about the computers at the scene of the consensual search, he had no further involvement in the case. (Tr. I at 113) In cross-examination, Special Agent Gentry testified with respect to guidance he provided during the search, "Since it was not our case or the FBI's case, I just made suggestions on what I thought would be important." (Tr. I at 116)

The Court does not find that the investigation became a joint state and federal operation just because Special Agent Gentry responded to the scene of a consensual search and provided some guidance as to what constituted computer media. As Special Agent Gentry characterized the situation, it was "a police matter" and "not ... the FBI's case." Stephanie Brewer went to the police, the police served the ex parte order of protection on defendant Brewer, the police obtained a consent to search from Mrs. Brewer, the police executed the search of the Brewer residence, the police seized items from the residence and the police took statements. It only makes sense that the police would go to state judges to seek warrants to search the seized items. Initially, state charges were filed. (Government's Response in Opposition to Defendant's Motion to Suppress Physical Evidence at 25)

Nevertheless, even if the participation of one federal agent in a state investigation makes the investigation a joint operation, defendant has provided to authority to suggest that a state court judge

Case 4:07-cr-00114-ODS   Document 41   Filed 04/04/08   Page 33 of 35

would lack jurisdiction to issue a search warrant in such a joint operation. Defendant's argument must fail.

8.    The Leon Good Faith Exception

Even if probable cause did not exist for the warrants at issue (which this Court does not believe to be the case), the <u>Leon</u> good faith exception would support the admissibility of the evidence seized pursuant to the warrants since it appears that the officers executing the warrants were acting in "objectively reasonable reliance" on warrants issued by a neutral judge. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984); <u>United States v. Murphy</u>, 69 F.3d 237, 241 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 516 U.S. 1153 (1996). Associate Circuit Judge Robert Beaird and Jackson County Circuit Judge Preston Dean found probable cause for the issuance of the warrants.

The Eighth Circuit has set forth the following with respect to exceptions to good faith reliance:

> Ordinarily, a police officer cannot be expected to question a judge's probable cause determination. Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth. Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

<u>Murphy</u>, 69 F.3d at 241 (quoting <u>United States v. Gibson</u>, 928 F.2d 250, 253-54 (8th Cir. 1991)). Stated another way, there are four "exceptions" wherein reliance upon an invalid search warrant is per se unreasonable: (1) the affiant misled the judge by including information in the affidavit that the affiant knew was false or would have known was false, except for a reckless disregard for the truth; (2) no reasonably well-trained officer could rely on the warrant, as it was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) the judge wholly abandoned his neutral and detached position and acted as a rubber stamp; or (4) the warrant itself is so facially defective that the executing officer cannot presume its validity. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

The "exceptions" to good faith reliance do not apply in this case. No evidence was presented to suggest that the officers misled the judges by including information in the affidavits that they

34

knew to be false or would have known to be false, except for a reckless disregard for the truth. No evidence was presented to suggest that the judges abandoned a neutral and detached position or acted as a rubber stamp. Further, the Court cannot find that the affidavits were so lacking any indicia of probable cause or the warrants so facially defective that the executing officers could not presume the warrants' validity.

IV.  <u>CONCLUSION</u>

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Brewer's Motion to Suppress Physical Evidence (doc. #22).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

          <u>           */s/ Sarah W. Hays*           </u><br>
SARAH W. HAYS<br>
UNITED STATES MAGISTRATE JUDGE

Case 4:07-cr-00114-ODS   Document 41   Filed 04/04/08   Page 35 of 35